The next case on for argument is Legg v. Wilson v. Ulster County, et al. Good morning, may it please the Court, Stephen Bergstein for the plaintiffs, Ann Marie Legg, Patricia Watson. We have two primary issues of substance on this appeal. We have the pregnancy issue, we have the hostile work environment issue. I'll start with the pregnancy issue. Under the Pregnancy Discrimination Act, women are not supposed to choose between working and having children, and they are supposed to be on equal footing with any employees whose temporary impairments entitled them to work light duty. Those principles are implicated here. Now, didn't — there was a bench trial on the disparate impact, right? We're no longer talking about disparate treatment at all. You haven't appealed the jury verdict against your client on that. Correct. Okay. So the — in this bench trial, the district court, as I understand it, found as a fact that Ms. Legg was not disabled by her pregnancy in any way, and that — at least she was not in July when this application for light duty was filed. Do I have that right at all? I don't think he said she wasn't disabled. I don't think he said she wasn't disabled. I think he — what he said was she couldn't prove that the policy falls disproportionately on pregnant employees. He had a footnote in which — Isn't there a problem? And suppose it did fall disparately on pregnant employees who have some disability? Because after all, the point isn't that people who are pregnant have to be treated like people who are disabled. It's that people who are pregnant and are therefore not able to perform full duty have to be treated like other people who are disabled. That's right. Right. So if she's not, in fact, disabled by her pregnancy, then doesn't — if nothing else, she would lack any injury from a policy, even if the policy was improper. That's the central flaw of what the district court did. There are two errors in what the district court did, but let me start with that, because it starts with the July 8, 2008 doctor note that says, I'm treating Ann Marie for her pregnancy. She can't work directly with inmates. Once she comes in with that note, they should have immediately assigned her to light duty, just as if she suffered a work-related injury. I mean, the district court says, I'm going to disregard that note because the doctor a day later said something absolutely opposite to it. So it's not credible evidence as to whether she is disabled. But that's completely unreasonable, because, number one, once they saw the July 8 note, that should have been enough to trigger the light duty policy and say, OK, you're now going to work in the control room. And what they said — Wait, as soon as a doctor sends a note that does not, in fact, say, here's a medical issue, because this woman is pregnant, that means she can't do specific things, all the note said was, she's under my care for being pregnant, and she should not have contacts with inmates. And as soon as that is said, there is no possibility of questioning that. They didn't question it on the basis that Your Honor's questioning it. They simply looked at the note and said, oh, no, you don't get light duty because you weren't injured on the job. Pregnant women don't get light duty under the policy. Go back to your doctor, get a reevaluation. And what happens? The next day she goes back and she gets the note that you need. And don't we all have experience of — wouldn't it be a reasonable thing for a fact finder to say that, look, we've all seen doctors — it's not that they lie, it's that they want to accommodate their patient. If the patient wants to be — have the employer be told they can work, they're happy to say that. And if the patient wants the employer to be told they can't work, they tell them that. And they're not really focused on the rigors of this particular job. They're just saying, you know, it might be better, all things considered, to give this person a little break. And if the person doesn't want that said for whatever reason, then they're perfectly happy not to do that. So — That argument supports our position, because she gets the note that she needs in order to work and earn the salary that she needs to support a family. Right. But why can't the fact finder — why does the fact finder have to say the first note was the real truth and the second note was a dishonest accommodation? You've got the same person saying two opposite things within two days. How can it be clearly erroneous for the fact finder to say, I'm just going to disregard that and look to the fact that she then went on and performed full duty for many months without any untoward difficulties? There were untoward difficulties. That's the problem. In October, she told Sergeant Winter, I can't do this. And Sergeant Winter, in an email, said, OK, you'll work light duty, and then he wrote an email memorializing that transaction, because he knew there was a problem because she complained. And then look what happened in November. Now she's in her seventh month of pregnancy. She's still working full duty in a jail with up to 24 roommates in dorm two. She testifies she can't stand up quickly. She can't sit down quickly. She's got all this weight in front of her. And she's supervising 24 roommates by herself without a weapon in her seventh month. And what happens? A fight breaks out. She can't do her job. So where is the evidence that she can't do her job? Isn't there testimony that the district court could fairly rely on that, you know, we're not the fact finders here, the district court is, evidence the district court could have relied on that said she actually did exactly what any officer in that situation was instructed to do, which is call for backup? But that's not really doing her job. So she's waiting for backup to come while some inmate is getting beaten up in the bathroom stall. She can't break it up. And she herself is at risk. The great argument for the fact finder, but the fact finder credited testimony from the sheriff that she did a terrific job. She did what any officer should have done in that circumstance. She's in her seventh month. She can't, she can barely stand up. You're going to put somebody in her seventh month in a situation like this. She has no business working in that dorm in her seventh month. This is why the light duty policy was illegal as applied to make any difference, whether she, uh, what her condition was in the seventh month versus what it was in the third month when she made this application. No, because in the third month that brings us back to the doctor's note, getting a doctor's note the second day with a contrary decision with a contrary opinion. We all know why the doctor wrote what he wrote. She can't live on 32. We all know, well, it's a fact finder made a fact finding about this and the fact finder chose apparently to think we all know what the doctor did, or at least the fact finder thought he knew what the doctor did on day one as well as on day two. It's not reasonable because it's the next day. It's the next day. Why else would she get a note that says that one day later when they tell her, get a real evaluation from your doctor if you want to work full time, that's what she does because she's making a choice now between, um, working full time and having a family and it's a Hobson's choice. And she shouldn't have had to make that choice. They should have looked at the July 8th note and said, okay, you're working light duty. Go work in the control room for the next five months. You'll never have contact with inmates and when you have the baby, you'll go back to full duty. And can I just ask one more question about the, uh, the disparate impact as such? One of the things we talked about in the previous opinion, uh, in this case, uh, was that something that would be useful evidence from which inferences could be drawn about intent, but it seems to me something that is also highly relevant to disparate impact is to compare the number of people who are affected by this policy by virtue of being pregnant. Zero pregnant people can get the benefit of light duty against what the proportion of people who are partially disabled for reasons other than pregnancy, uh, who get the benefit of this policy. Because for example, if 99% of the people who have non-pregnancy related, uh, disabilities also can't benefit from this policy and it's only a relatively rare exception that somebody gets the benefit of light duty because they were injured, uh, on duty. Would, uh, is it your position that that would also be a disparate impact? Yes. You get light duty if you're hurt on the job and there is evidence that. But what if, what if that is a very rare thing? Well, there's still a policy that they're applying against her. So if there was a rule, for example, a sort of a superhero rule, let's call it, that in the fire department, nobody gets light duty, but once they made an exception for somebody who, uh, had been injured, uh, on the job in a remarkable exercise of heroism and got the key to the city as a result, allowing that one exception would invent, wouldn't mean that anyone who's pregnant has to get a light duty. Yes, because you are extending a privilege to somebody, uh, based on their inability to work. And isn't the real problem here? Not a light duty policy. Isn't the real problem that there's a state law that says that most people who are ill in some way have to take their sick days. And when they run out of sick days, they get unpaid leave. But someone who is injured on the line of duty in the line of duty has to be paid the whole time. Is that, isn't that what you really should be challenging that she should be entitled to stay home because that policy has a disparate impact on pregnant people compared to people who are disabled by reason of a job related injury? Well that's one way, that's another argument you could make. But if you're coming into work and you want to do the work, but you can't work full duty, but you need the full pay, which is what she did, which is why she got the second note, the policy is not being fairly applied to her because she's similar in her inability to work. But these other men and women who are disabled in the line of duty are entitled by the state law in effect to stay home and get paid. And the sheriff makes them come in if they're able to do something that could be useful. That's the policy. That's the policy. Right. So there's an Achilles heel to the district court's analysis. He cites a case from the eighth circuit from 1994 Armstrong that says she has to show that no pregnant woman can work full duty at the jail. That can't be the standard. The standard has to be whether she is somehow victimized by the policy. And for the reasons we've argued, she was because she had to make this choice. The issues of business necessity never came up in the post-trial decision. I'm running out of time here, but there's also . . . We're running out of time. We're well out of time. Maybe we should talk about Ms. Watson and her . . . Oh, the hostile work environment. Okay. In this instance, the district court got it right. The jury had a basis to find that there was a hostile work environment against Officer Watson based on the following evidence. You have Officer DeVorel subjecting plaintiff to unwanted harassment, breathing down her neck, the vibrating chair, all of that. You have three years of pornography in the jail. Oh, I'm sorry. Maybe I misunderstood. So you're really now just responding to the cross-appeal? Correct. You don't have any . . . Ms. Watson doesn't have any beef with what the district court did? Or am I missing something? Correct. Okay. Correct. Why don't you . . . or you can use up your rebuttal time if you want to . . . I'll talk about it. . . . something that hasn't been argued. I'll discuss it in rebuttal. I'm sorry. I distracted you because I forgot which foot the shoe is on with respect to Ms. Watson. Mr. Kelly, good morning. Good morning, Your Honor. With regard to Judge Lynch, the point of Judge Scullin's decision is page 18, where he says, what is absolutely lacking in this case is any evidence indicating that pregnant women were unable to perform full duty at the jail. That's consistent with the evidence here. There was no medical evidence presented at the trial to suggest that Ms. Legg had any difficulty whatsoever. She went back to work in July and worked without complaint all the way through November. What about the situation that Mr. Bergstein pointed us to, which is her inability at a time there was a fight breaking out to go in and deal with it? No issue with that because the sheriff himself said that when you're on duty and there's a fight, you call for backup. Is that the only thing you do? That seems to me pretty stupid, that you call for backup, of course, but you just stand there and watch this melee take place? Doesn't the sheriff have a vested interest in saying, oh, she did exactly the right thing since he or the county is being sued, or the very thing that she's saying I can't do? If you would take the minimum manpower requirements, establish what we have to do at the minimum manpower requirements, have us have a CO at that particular location and another CO in a guarded area. And when there's a fight, they call for backup. And the backup is responsive within a short amount of time. But the difficulty is, is that they do not want to expose any CO to the fact that there may be contraband involved in that fight, that they may suffer greater injury as a result. And so the procedures that have evolved, and I don't pretend to be a police expert or a correctional expert, tell us that you back off until there's greater numbers of COs there. And yes, you could be, I suppose, somewhat heroic, but that would also place you in danger and potentially make you a hostage. And so that's why they wait for the greater numbers. Then the record also shows that apart from being pregnant, she's something like 5'6", and the guy who was apparently the aggressor in the fight, or at least the winner in the fight, was some huge... 6'4", and that's in the record. So, you know, the likelihood that you would want that to happen is... But at the same time, after that fight and after that incident, then she stays home for the rest of her pregnancy. And isn't there also evidence in the record that while other pregnant women had worked well into their pregnancy, they also stopped working at something like 7 1⁄2 months? Yes, and we didn't have any evidence in the case that was presented by Ms. Legge that suggested that she had medical reasons. No doctor came in for her to testify. Wasn't the county aware of her previous history of numerous miscarriages and, you know, that she was a kind of high-risk pregnancy? Am I wrong in remembering that? Well, we don't have anything. We knew that she had... There was some colloquy in the case with regard to she had a problem pregnancy, but we had no evidence presented at trial to suggest that that would put her in some different classification. So are we required to just overlook what's kind of common experience that pregnant women tend to be more vulnerable physically because they're, you know, of the condition and because they're carrying a fetus than the ordinary person? I think that what we cannot do is that we cannot make a generalization about any in particular pregnant person, but we must wait for the receipt of some evidence from an obstetrician to tell us what the person can and can't do. And in our particular... It needs to be particularized. I mean, as to the disparate impact claim, the district court found that facts must be established to show that the complained of policy disproportionately impacts pregnant women. And we had an absence. And I suggest to you, Judge... So just putting an OBGYN on saying pregnant women are vulnerable, would that have done it? No. I would have cross-examined that obstetrician with regard to that, and I would have had to look for some more backup. I mean... The judge said statistical evidence wasn't necessary. Well, I would submit that in this particular case, we had proof that other pregnant COs had worked and that at some particular time near the time that they were going to give birth, they left. And we would only speculate as to why they left at that point. And when you say they left, did they cease working? Did they cease getting paid? Or were they on leave? What was their condition status when they left? I mean, some of them saved sick leave. Some of them saved vacation time. But they definitely left. And then after maternity leave, came back to work in the same capacity. So there was an absence of proof. And I would submit that what we have here is we have a forced work policy. It's a misnomer to call it a light duty policy. In the record, it will show you that these people who are out on 207C have to show up every week and the sheriff can force them to go to work. And so I submit to you that it's a misnomer to call it a light duty policy. It's really a forced work policy. And nobody can ask for light duty. Light duty is only something that the sheriff can direct you to do if you're out on leave for a job-related injury. Which confirms Judge Lynch's hypothesis about the real economic realities of this situation and the effect of the state statute. Right. And cost can be a reason, but it can't be the only reason. And here we have minimum manpower requirements by the Commission on Correction. So if I can, I just— Can we go back for a moment to what happens in July when the doctor's note comes in? You know, it's one thing to look at this retrospectively at the end of the process and ask the question, well, she did do the work, and well, looking at it now, we could have experts come in and talk about what the state of her pregnancy was or wasn't. Isn't the question really, what is the jail supposed to do when someone comes in with a doctor's note that says, I'm pregnant, and the doctor's note says, she's pregnant, and as a result, she should not have contact with inmates? Now, are you entitled to then at that point say, I need the doctor to tell me something else, and what is it that the doctor—you know, what judgments is the sheriff entitled to make to second-guess the doctor's prescription? Well, just the vagueness of that note, not to have contact with inmates. This is not a work setting that's a public library. It's a work setting that's a correctional facility, and I think it has to be judged in that particular context. Well, even so, would you think there's a difference between saying at that point, well, Officer Legg, I'm not sure what this says, have the doctor give me more information, and saying, hey, you've got to get a note that says you're able to do work, full work, because if you can't, you just have to take your sick leave. When that runs out, you take unpaid leave, and you're on your own. I mean, that's a different response than I'd like more information from the doctor, isn't it? Well, the response, of course, has to be that, as the Young case says, the pregnant individual is not the most favored nation. She doesn't get a preference over everybody else, and so long as we're not treating them differently, and in this case, we didn't treat her differently because she presented no evidence of any particular disability. There was a vague note, and she wasn't injured on the job. So we have sick leave policies at the jail, and if you present a note that you're sick, we let you go out on sick leave, and we, of course, follow up on that to prevent abuses, but that was not the note. The note was she can't work around inmates. Well, for obvious reasons, the correctional facility is full of inmates, and so we say- But there are jobs. I mean, it's not really disputed that there are jobs that do not require inmate contact at all and that do not require you to respond to emergencies. And there's a very limited number of those per shift, and here, that was an opportunity for the plaintiffs to put in statistical evidence to demonstrate that we treated people differently, and they didn't because, I submit, you can infer that the statistical evidence wouldn't have helped them. Here, there's- There's one point of something like five or six people at one particular moment who were in the category of injured on duty and available for light duty? I think that there's one exhibit in the case, and it has a listing of people, including those on military leave as well, and the number is insignificant, I submit, compared to the number of people we need working on every particular shift to guard 350 inmates. If I could just jump over to Watson, we are obviously bringing our appeal in that regard to suggest that the testimony with regard to the work environment in that particular case is insufficient to meet the standards of this court to justify a verdict on either Title VII or on 1983 under a Monell standard. The infrequency of the complaints here demonstrate that this were mere utterances, and it did not affect Mrs. Watson's ability to do her job, which she continued to do, and- Are you sure you said they were mere utterances? She said that she and others testified that there were pornographic screensavers up and pornographic magazines around that they complained about repeatedly over several years. There were two- Those aren't stray utterances. No, I meant also to say there's two corporals who were suggested that they had screensavers, but there was no complaints about them presented to the officer who receives complaints. He testified at trial and said, I never received complaints about any of this from Mrs. Watson or the other plaintiffs who were involved in the underlying case. They observed it to the wrong person? Well, there certainly is a duty for you to report this in the appropriate fashion, and here they had yearly seminars at which Mrs. Watson, proof was at trial, she attended those seminars, and that particular officer indicated, I'm the person to come to, and nobody ever came to him. So I agree with you that those particular pieces of testimony suggest offensive matters, but clearly the plaintiffs were not so aggrieved that they wanted to complain about them, and particularly in the underlying case, there was also proof of telephone conversations between the COs with regard to how they viewed their workplace. And as I said before on the other particularization on the pregnancy discrimination, this is not a public library. It's a correctional institution, and- What does that mean for having pornographic materials around? I'm talking about with regard to the fact that it's a culture and a place that has different tones of voice, and people, if they're not going to complain about those tones of voice, if they're not going to alert the sheriff or the deputy with regard to them, that puts a different twist on it. And I submit that the underlying matter, granting the verdict under Title VII, should be reversed. Thank you. Thank you, Mr. Kelly. Mr. Bergstein? Okay, I'll make one point about the pregnancy, then I'll talk about Watson. Counsel said at some point there was no complaint by Anne-Marie Legge about having to work full-time. Page 312 of the appendix is the email from Sergeant Winter that recounts that exchange, where she was concerned about safety, and he put her in light duty. So that's why what happened in July had an effect all the way through November when the fight happened. On Watson, I don't think there's a serious factual question about whether the plaintiffs properly complained. This was a jury verdict. And the district court said at page 22, the jury could have concluded that officials at the jail acquiesced to the existence of the pervasiveness of the pornographic material and the use of explicit screensavers. So management knew. And the district court on three occasions in his ruling pointed out how management dropped the ball in the face of their knowledge of the widespread pornography and sexual harassment going on in the jail, three bases upon which the jury could find management was liable under Title VII. In addition to that— Can I ask a couple of different questions, actually? One, supposing I agree with you that the judge was wrong to take away the— to give judgment as a matter of law on the 1983 claim, right? Because you've got an appeal on that basis, don't you? Correct. Yeah. So suppose I agree with that. Do we just reinstate the $200,000 verdict, or does it go back to the district court to now rule on the remittiture aspect of the motion? The second. Okay. That's— And then just one other— That's what I thought. But if that's so, I guess one of the things that has puzzled me about the case is this was litigated in the remittiture motion phase as a case where the jury awarded $400,000 worth of damages. And that makes sense to me. Why is there duplicative damage? I understand there are two theories, or two causes of action—1983 and Title VII— but isn't there really one unitary injury that suffered? Well, the jury divided it up between causes of action. The jury said there's $400,000 worth of damages here and we'll divide it between the Title VII and the 1983. Defendant never made that argument throughout this case. We've been litigating this forever. Forever. That's the first time that precise issue ever came up, is whether they were duplicative. But the jury is allowed to divide it up the way it did. The jury divided it up that way, and so it would go back and the judge would decide whether it's appropriate to have a remittiture to $75,000 on the second claim as well as on the first, or to some other number. Correct. Okay. The other question has to do with the waiver argument, right? Because you argue that, as I understand it, that all of these motions by the other side were untimely in the first place. And I guess what I'm wondering— I don't even understand what the district court found as a way of waiver— but isn't there a clear waiver at an earlier point? In other words, the error that the judge made was in extending the time, which he wasn't allowed to do under Federal Civil Procedure 6B-2. And when he did that, you didn't object. No one objected. Everyone was sort of happy with having more time to consider, including you, who also got the benefit of taking more time to consider whether to make motions addressing the verdict. And then when they made their motions, according to the schedule that the judge erroneously set, suddenly the judge says, oh, sorry, it's untimely. But wasn't that matter— I mean, if the district judge made a mistake here, the mistake he made, he made weeks earlier, and no one objected to that. Well, that was at the end of trial. But the judge didn't say, you can go beyond the 28 days. He said, you file your post-trial motions two weeks after you get the transcripts. That's not the same as saying you can go beyond one month. Okay? So he technically didn't violate the 28-day rule. But the other—you're laughing, but the other point— I'm laughing because I hadn't thought of that. That's a very clever point. It's in the brief. The other point is this. This case—that issue has not been litigated as extensively as you might think. But the standard around the country seems to be this. If the judge makes that mistake, and nobody says anything at the time of the mistake, but they raise it in the merits brief, as long as you raise your objection before the judge resolves— One circuit says that, and one circuit says the opposite. And we cited both of those cases in our prior opinion, and I thought we were asking the district court to make a ruling in the first instance of how to address this, and he went off in a different direction. There was constructive waiver. But the common-sense rule is this. If we raise our objection before the judge resolves the motion on the merits, isn't that enough? And there are cases where that happens. But, you know, if somebody had said—and this is the whole point of contemporaneous objection rules— if somebody had said to the judge, wait, judge, wait until you get the record, which also I think any human being who's not a lawyer and an adept in the federal rules of civil procedure would think is a pretty reasonable way to decide when you can file your post-trial motions is after you get the record. But if someone had pointed out to the judge, oh, you know, yeah, two weeks after we get the record, so long as that's within 28 days, because otherwise you're violating the rule, the judge presumably would have done something different. But no one did point that out to him. That's true, but that's what happened, I think, in the Dill case. In the Dill case, right. But as long as Dill raises his objection when the motion comes around, that's enough. That's what happened. When this got remanded, I raised it. And, you know, we never had a chance to object when the untimely motion came in because the judge— Of course you did. Why object? I agree with you 100% that you can't be taxed for not making an objection at time two when the judge already ruled in your favor without even hearing from you. Now, if I'm right on this, that we didn't waive, what that means is defendants' post-trial motions never happen. Right, never happen. Which means the Title VII verdict comes back in full. The 1983 verdict comes back in full. Oh, wait, wait, wait, wait, wait, wait, wait. The Title VII verdict comes back in full? No, no, no, no, no. Which you agreed to accept the remitter? I'm—the 1983 verdict comes back in full. Well, perhaps the Title VII verdict comes back in full because there was never an opportunity for the judge to make a remitter decision. The motion post-trial was a remitter decision. But you did make it, and you accepted it. Well, are we going to— You should come back later and say—I mean, that's the whole point. If you didn't accept it, then none of this would have happened, and we would have been back having a new trial before any of this came to us. But you bought into it. Well, we're going to deny the remitter so we can have a second trial, so then we can claim we didn't waive? I mean, the point—the standard seems to be, from other circuits, is the issues are they separate and distinct. If the issue you take the remitter on is separate and distinct from everything else, then you're not waiving the everything else. And the remitter is not the same as—that's a separate issue. I understand the everything else. I'm asking, are you telling me that you are taking the position that you can actually reinstate the $200,000 Title VII verdict, notwithstanding having accepted the remitter, if we decide that the motions were untimely with respect to a completely different cause of action and a completely different claim, as to which there was no express waiver of an objection to the motion and the grant of the motion? It sounds like I should agree with you on that. Well, no. But the point—but if you really— I think you should, of course. But if you think— But you have a right to make any argument as to why I'm wrong. But they're still separate and distinct. Now, think about the consequences if you're right. So we say, no, we're not taking the remitter. We want a new trial on damages. You have another trial. Just so you can claim on appeal that we never waived our objection to the post-trial motion. That seems far afield. Well, but that's exactly— Suppose there were no 1983 claim in the case and it was just a straight Title VII case, that were the only cause of action. You would be in exactly that position. You made an argument this is waived and you made an argument there shouldn't be a remitter. The judge rejects those arguments and grants the remitter. You then have a choice. You can go through the trouble of a new trial and I recognize that's a lot of pressure to put a party under but that's exactly what the rule requires. It's not a final order. So you either go through that or you accept the remitter and the case is over. So I'm trying to figure out why it should be— Because you've got another whole  that you are arguing and I'm inclined to think correctly you have still a right to raise the untimeliness issue as to that as to the 1983 but that also trumps the normal rule about accepting remitters. But there is no normal rule in this circuit by the way on separate and distinct. I don't see any case that really gets into this Yeah, they're the ones who are saying there's no separate and distinct rule and by accepting the remitter you lose everything. That's because we're operating on a clean slate but I would concede I have more to gain by bringing back the 1983 claim than bringing back the lost damages. Oh, I appreciate you. You're entitled to make the argument. I'm just not that persuaded by it. All right. Thank you. Thank you, Mr. Bergstein. Thank you, Mr. Kelly. We'll reserve decision in this case.